NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DONNA L. CULLINS, *Petitioner*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent*,

SEQUEL YOUTH AND FAMILY, *Respondent Employer*,

PMA c/o GALLAGHER BASSETT SERVICES, *Respondent Carrier*.

No. 1 CA-IC 16-0022
FILED 4-18-2017

Special Action – Industrial Commission
ICA Claim No. 20130-500189
Carrier Claim No. 011975-079287-WC-01

Deborah Nye, Administrative Law Judge

**AWARD AFFIRMED**

COUNSEL

Joel F. Friedman, PLLC, Phoenix
By Joel F. Friedman
*Counsel for Petitioner*

Industrial Commission of Arizona, Phoenix
By Jason M. Porter
*Counsel for Respondent Industrial Commission of Arizona*

Lundmark, Barberich, LaMont & Slavin, P.C., Phoenix
By R. Todd Lundmark, Danielle S. Vukonich
*Counsel for Respondent Employer and Respondent Carrier*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Jon W. Thompson joined.

---

**W I N T H R O P**, Judge:

**¶1**        This is a special action review of an Industrial Commission of Arizona award and decision upon review finding the petitioner employee, Donna L. Cullins ("Cullins") medically stationary with a ten percent permanent impairment to the right lower extremity. The administrative law judge ("ALJ") resolved the issues in favor of the respondent employer, Sequel Youth and Family ("Sequel") and the respondent carrier, Pennsylvania Manufacturers Association c/o Gallagher Bassett Services (collectively, "Respondents"). Because the ALJ's determinations are reasonably supported by substantial evidence, we affirm the award and decision upon review.

**FACTS AND PROCEDURAL HISTORY**

**¶2**        On February 12, 2013, Cullins injured her right ankle at work while climbing the stairs. At the time of her injury, Cullins weighed over 300 pounds and was wearing a prescribed "boot" due to a prior industrial injury to her right foot and ankle that occurred in December 2012.

**¶3**        After her February 2013 injury, Cullins filed a workers' compensation claim, which the respondent carrier accepted. Dr. Stephen Knecht ultimately performed a "complex reconstructive surgery" on Cullins' right ankle in August 2013. Before the surgery, Dr. Knecht informed Cullins that her weight was "a significant factor [affecting] the potential for a poor outcome after her surgery."

**¶4**        After the surgery, Cullins continued to report significant pain in her right ankle and foot. Dr. Knecht emphasized his concerns about Cullins' weight "as a potential limitation in further healing of her ankle soft tissue reconstructions," and he gave Cullins an informational flyer on bariatric surgery.

2

¶5        In May 2014, Cullins met with bariatric surgeon Dr. Kurt Sprunger, who determined that Cullins was a candidate for bariatric surgery because of her body mass index.[1]  Cullins also had multiple other medical conditions that could affect the potential success of any surgery, including hypertension, obstructive sleep apnea, prediabetes, and asthma.

¶6        Because Cullins' health insurance required patients to undergo six consecutive months of physician-supervised weight loss before approving coverage for bariatric surgery, Dr. Knecht and Dr. Sprunger provided written statements to expedite the approval process for Cullins. Dr. Knecht's letter stated that Cullins' obesity was "contributing to a significant amount of her ankle pain" and that "prolonging her [access to] bariatric surgery will progressively injure her ankle and potentially may create permanent issues not correctable by reconstructive ankle surgery in the future."  Dr. Sprunger's letter reiterated Dr. Knecht's concerns and requested the insurance company lift the six-month requirement so that Cullins could undergo bariatric surgery "as soon as possible."

¶7        In June 2014, Dr. Knecht recommended closing Cullins' industrial case and transitioning her to supportive care status.  He indicated Cullins had sustained a permanent impairment rating of ten percent to the lower extremity, but noted that "[t]he case will more than likely need to be reopened once [Cullins] has completed her . . . bariatric procedure . . . to discuss reconstruction of her ankle if the pain is not relieved with the weight loss."

¶8        In October 2014, Cullins attended an independent medical exam ("IME") conducted by Drs. Irwin Shapiro and Ernie Riffer.  The doctors' IME report stated there was "absolutely no indication for further surgery in regard to [Cullins'] right ankle related to the [industrial injury]," and that Cullins was medically stationary.

¶9        The following month, Dr. Sprunger performed bariatric surgery on Cullins.  During the nine-month period after her surgery, Cullins lost eighty-seven pounds, which represented forty-five percent of her excess body weight. Dr. Sprunger testified that his average patient loses sixty-four percent of excess weight within six months of bariatric surgery,

---

[1]        A patient's body mass index is "a calculation based on the patient's weight taking into consideration their height."

and Cullins had "significantly less weight loss than the average for [his] patients."

**¶10**          In January 2015, the respondent carrier terminated Cullins' temporary benefits effective December 16, 2014, assigning a ten percent permanent impairment to her right lower extremity. Cullins timely requested a hearing protesting the closure of her claim. She argued that she required further care for her right ankle and that her bariatric surgery should be covered as part of her workers' compensation claim.

**¶11**          In September 2015, Cullins attended a second IME with Dr. Shapiro. In his IME report, Dr. Shapiro opined that Cullins was medically stationary and that "as long as [Cullins] remains in her present physical state of obesity, it is highly improbable that any type of salvage procedure [for her ankle] would be even a remote possibility."

**¶12**          The ALJ held hearings in September 2015, January 2016, and February 2016, and heard testimony from Cullins and Drs. Sprunger, Riffer, Knecht, and Shapiro.

**¶13**          On February 26, 2016, the ALJ issued her award, adopting the opinion of Dr. Shapiro as more probably correct and concluding that Cullins' injury was "medically stationary with a 10% impairment and work restrictions as set forth by Dr. Shapiro, and that [Cullins'] bariatric surgery was not a compensable consequence of the industrial injury, nor was it required to treat the injury."

**¶14**          Cullins requested review of the ALJ's award, and the ALJ issued a decision upon review summarily affirming the award.

**¶15**          Cullins timely filed this petition for special action, and we have jurisdiction pursuant to Arizona Revised Statutes sections 12-120.21(A)(2) (2016) and 23-951(A) (2012), and Rule 10 of the Arizona Rules of Procedure for Special Actions.

## ANALYSIS

### I.    *Standard of Review*

**¶16**          A claimant generally bears the burden of establishing the material elements of her claim. *See Estate of Bedwell v. Indus. Comm'n*, 104 Ariz. 443, 444, 454 P.2d 985, 986 (1969). Where an injury is not readily apparent to laymen, the need for further treatment and the existence of a permanent impairment must be established by expert testimony. *See Yates*

*v. Indus. Comm'n*, 116 Ariz. 125, 127, 568 P.2d 432, 434 (App. 1977); *Norris v. Indus. Comm'n*, 11 Ariz. App. 50, 53, 461 P.2d 694, 697 (App. 1969). The ALJ resolves conflicts in the medical evidence, draws warranted inferences, and is the sole judge of the witnesses' credibility. *See Carousel Snack Bar v. Indus. Comm'n*, 156 Ariz. 43, 46, 749 P.2d 1364, 1367 (1988); *Malinski v. Indus. Comm'n*, 103 Ariz. 213, 217, 439 P.2d 485, 489 (1968).

 II. *Application of Beasley*

**¶17** Generally, employers are not liable for conditions that do not result from the industrial injury. *Beasley v. Indus. Comm'n*, 175 Ariz. 521, 522, 858 P.2d 666, 667 (App. 1993). In *Beasley*, the claimant began suffering from hyperparathyroidism ("PTH") and kidney stones after his claim for an industrially-related back injury was reopened. *Id.* A medical expert testified that the claimant's PTH was unrelated to his industrial injury, but untreated PTH would worsen the claimant's injured spine and prevent further back surgery. *Id.* This court concluded that "the necessary causal connection" between the claimant's back injury and his PTH did not exist because the PTH "require[d] treatment regardless of the industrial injury" and any worsening of the back injury because of the PTH was "only a coincidental effect." *Id.* at 524, 858 P.2d at 669. Therefore, "even when an unrelated condition will worsen an industrial injury, and even when the industrial injury cannot be treated without first treating the unrelated condition, the unrelated condition is not compensable without a causal connection flowing from the industrial injury to the unrelated condition or its treatment." *Id.*

**¶18** Cullins argues that her case is distinguishable from *Beasley* because, unlike the claimant's treatment for PTH in *Beasley*, Cullins' bariatric surgery was not "independently necessary," but rather directly related to her ankle injury. She contends that Dr. Sprunger requested expedited insurance authorization "only . . . because of Dr. Knecht's concerns about [the] effect of [her] obesity on her right ankle injury." However, Dr. Sprunger's decision to request expedited authorization because of Cullins' ankle injury has no bearing on whether the surgery was "independently necessary." In fact, Dr. Sprunger testified that, had he seen Cullins before her right ankle injury, her body mass index alone would have led him to recommend bariatric surgery. Further, Dr. Knecht testified that there was no specific surgical procedure he suggested for Cullins' ankle even if she successfully reduced her weight. Accordingly, we conclude that any worsening of Cullins' ankle condition resulting from her weight was coincidental, and the ALJ did not err in finding that her bariatric surgery was not compensable.

### III. Cullins' Other Arguments

¶19 Cullins also contends the ALJ erred in adopting Dr. Shapiro's medical opinion. According to Cullins, the ALJ should have adopted the opinion of Dr. Knecht, who "knew and understood and appreciated the full extent of [Cullins'] injury," but the ALJ instead "relied exclusively on what Dr. Shapiro offered not as a medical opinion, but as a resolution of the ultimate legal determination." Our review of the record does not support Cullins' assertion that Dr. Shapiro offered any legal conclusions. Rather, Dr. Shapiro testified as to his medical opinion that Cullins did not require weight loss after her ankle surgery to enhance her response to that surgery, and that, although "weight loss, from her general health standpoint, w[ould] be beneficial," it would not "increase the probability of a successful outcome of another [ankle] operation[.]" After hearing the doctors' testimony and reviewing the relevant evidence, the ALJ determined that the opinion of Dr. Shapiro was more probably correct. Because "conflicts in medical evidence must be resolved by the trier of fact," *Carousel Snack Bar*, 156 Ariz. at 46, 749 P.2d at 1367, the ALJ did not err in adopting the opinion of Dr. Shapiro over that of Dr. Knecht.

¶20 Finally, Cullins argues the ALJ erred in considering "information available only after the [bariatric] surgery," rather than medical opinions from experts before the surgery. Again, the record does not support Cullins' assertion in this regard. The ALJ's decision specifically references medical reports authored before Cullins' bariatric surgery. The ALJ also considered testimony from Drs. Knecht and Sprunger addressing Cullins' condition before the bariatric surgery. Accordingly, the ALJ did not err in her consideration of the relevant medical evidence.

## CONCLUSION

¶21 For the foregoing reasons, we affirm the ALJ's award and decision upon review. Respondents are awarded their taxable costs on appeal, subject to compliance with Arizona Rule of Civil Appellate Procedure 21.

